Filed 9/22/14  Hughes v. Pham CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TRENT HUGHES et al., | |
| Plaintiffs and Appellants, | E052469 |
| v. | (Super.Ct.No. INC048327) |
| CHRISTOPHER PHAM, | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** |
| Defendant and Appellant. | |
| | [NO CHANGE IN JUDGMENT] |

THE COURT

The petition for rehearing filed on September 8, 2014, is denied.  On the court's

own motion, the opinion filed in this matter on August 22, 2014, is modified as follows:

On page 41, remove the last paragraph in its entirety.  The paragraph begins with

"As plaintiffs point out . . . ," and ends on page 42 with "Accordingly, the trial court did

not abuse its discretion."  The last paragraph on pages 41-42 should read as follows:

The court did not state what near-term expenditures it had in mind.  As plaintiffs

point out, however, their life care expert testified that the standard of care required that

1

for the first five years of his injury, Trent should go annually to the spinal cord center at Craig Hospital in Colorado. There, during a three- to five-day stay, Trent would be exhaustively evaluated by multiple physicians, receive physical and occupational therapy and be evaluated for his functional abilities with the various devices he needed to use. After the first five years, he would need to attend that program only every four or five years. The witness testified that patients who attend that program typically live longer than those who do not, and a spinal cord patient who received optimum care could have a normal life expectancy. The cost of that program would be $7,000 for each of the first five years. Trent's attendance at that program could also result in additional equipment and medical costs if it were determined that Trent's needs would be better served by other modalities. Later, less frequent reassessments should suffice because Trent's needs would have been determined during the earlier assessments. In addition, plaintiffs' life care expert's summary of future care needs stated that modifications to Trent's home were required immediately to accommodate Trent's needs. Finally, both plaintiffs' and defendant's experts testified that for his overall well-being, Trent needed services and equipment that would allow him to maximize his independence as soon as possible. This evidence supports the trial court's conclusion that Trent needed larger payments earlier in his life than he would need later and at least minimally satisfies the fundamental goal of matching losses with compensation as the losses occur. (*Salgado v. County of Los Angeles*, *supra*, 19 Cal.4th at p. 650.) Accordingly, we cannot say that the court abused its discretion. On remand, however, the court retains the discretion to order a different payment schedule. (*Ibid*.)

2

These modifications do not change the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

RICHLI
J.

CODRINGTON
J.

Filed 8/22/14  Hughes v. Pham CA4/2 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| TRENT HUGHES et al., | |
| Plaintiffs and Appellants, | E052469 |
| v. | (Super.Ct.No. INC048327) |
| CHRISTOPHER PHAM, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Harold W. Hopp, Judge.  Affirmed with directions.

Steven B. Stevens; Center for Constitutional Litigation, Valerie M. Nannery; Waters, Kraus & Paul, David Bricker; Ely, Bettini, Ulman & Rosenblatt and Burt Rosenblatt for Plaintiffs and Appellants Trent and Lisa Hughes.

Cole Pedroza, Curtis A. Cole, Kenneth R. Pedroza, Cassidy C. Davenport; Davis, Grass, Goldstein, Housouer & Finlay, Jeffrey W. Grass and Ben Housouer for Defendant and Appellant Christopher Pham.

1

Tucker Ellis, E. Todd Chayet, Rebecca A. Lefler for the California Medical Association, the California Dental Association, the California Hospital Association, and the American Medical Association; Fred J. Hiestand of the Civil Justice Association of California as Amici Curiae on behalf of Defendant and Appellant Christopher Pham.

Plaintiffs Trent and Lisa Hughes appeal from a judgment in their medical malpractice case against defendant Christopher Pham, D.O. Plaintiffs contend that the statutory cap on noneconomic damages in medical malpractice cases (Civ. Code, § 3333.2),[1] which is part of the Medical Injury Compensation Reform Act of 1975,[2] or MICRA, is unconstitutional. They also contend that the trial court improperly calculated the offset resulting from their prior settlement with a former codefendant and erroneously calculated the amount of periodic payments for future damages.

Dr. Pham cross-appeals, contending, among other things, that there was insufficient evidence to establish causation, that the trial court erroneously excluded critical evidence, that the award for future medical care costs was not justified by the evidence, and that the judgment ordering periodic payments is erroneous in several respects.

We agree in part with plaintiffs and in part with defendant concerning the structure of the judgment, and will remand for further proceedings to correct it. Otherwise, we will affirm the judgment.

---

[1] All further statutory citations refer to the Civil Code unless another code is specified.

[2] (Stats. 1975, 2d Ex. Sess. 1975–1976, chs. 1 & 2, pp. 3949–4007.)

2

On November 2, 2003, Trent Hughes suffered a spinal cord injury while operating an off-road vehicle in the desert. He experienced immediate severe pain in his back and realized he was unable to move his feet, which felt numb and "tingly." He was taken by helicopter to Desert Regional Medical Center in Palm Springs.

Dr. Pham was the neurosurgeon on call. He was summoned to the emergency department upon Hughes' arrival. Hospital rules provided that Pham was required to respond within 20 minutes of being summoned. Although Pham insisted that he did respond promptly and that he did perform a comprehensive examination and evaluation of Hughes' condition, other evidence showed that this was not true. He did order an MRI, which showed that Hughes had a burst fracture of the first vertebra in his lumbar spine (L1) and compression fractures in the thoracic spine. Pham interpreted the MRI as showing 70 percent transection of the thoracic spine and concluded that prompt surgery to decompress and stabilize the spine at L1 was not necessary because the thoracic injury would render Hughes a paraplegic in any event. Pham did not operate until November 4, 2003.

Plaintiffs' experts established that the thoracic spine was not transected and had not sustained any injury which would have rendered Hughes a paraplegic in the absence of the L1 injury. The L1 injury was not complete—that is, it had not caused a complete loss of sensation and movement from L1 down—when Hughes arrived at the hospital. Hughes still had feeling in his legs and lower abdomen and could move his legs, and prompt surgery would have resulted in at least partial return of sensation and motor

3

function in his legs, as well as the return of bowel, bladder and sexual function. The delay in surgery resulted in the incomplete L1 injury progressing irreversibly, leaving Hughes a paraplegic with no bladder, bowel or sexual function. (We discuss the details of the testimony on this issue in our discussion of defendant's claim, in his cross-appeal, that the verdict is not supported by substantial evidence.)

Trent Hughes sued Desert Regional Medical Center and Pham for medical malpractice. Lisa Hughes sued for loss of consortium. Both settled with Desert Regional Medical Center and proceeded to trial against Pham. The jury found in favor of plaintiffs. Both plaintiffs and defendant filed timely notices of appeal from the amended judgment entered on March 8, 2011. (We discuss the details of the settlement and the verdict elsewhere.)

<u>PLAINTIFFS' APPEAL</u>

1.

SECTION 3333.2 IS NOT UNCONSTITUTIONAL ON THE GROUNDS ASSERTED BY PLAINTIFFS

*A. Introduction*

The jury determined that Lisa Hughes suffered $1 million in noneconomic damages and that Trent Hughes suffered $2,750,000 in noneconomic damages. The trial court reduced plaintiffs' noneconomic damages to $250,000 each pursuant to section 3333.2. That statute states: "(a) In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical

4

impairment, disfigurement and other nonpecuniary damage. [¶] (b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)." (§ 3333.2.)

Plaintiffs contend that the damages cap provided for in section 3333.2 violates constitutional guarantees of equal protection, the right to a jury trial, and separation of powers.

We determine the constitutionality of a statute de novo. (*Prigmore v. City of Redding* (2012) 211 Cal.App.4th 1322.)

*B. Background*

MICRA is a comprehensive statutory scheme enacted by the Legislature to address "serious problems" associated with the rapid increase in medical malpractice insurance premiums throughout the state. (*American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 363 (*American Bank* ).) "In broad outline, the act (1) attempted to reduce the incidence and severity of medical malpractice injuries by strengthening governmental oversight of the education, licensing and discipline of physicians and health care providers, (2) sought to curtail unwarranted insurance premium increases by authorizing alternative insurance coverage programs and by establishing new procedures to review substantial rate increases, and (3) attempted to reduce the cost and increase the efficiency of medical malpractice litigation by revising a number of legal rules applicable to such litigation." (*Id*. at pp. 363-364.)

"[I]n enacting MICRA the Legislature was acting in a situation in which it had found that the rising cost of medical malpractice insurance was posing serious problems for the health care system in California, threatening to curtail the availability of medical care in some parts of the state and creating the very real possibility that many doctors would practice without insurance, leaving patients who might be injured by such doctors with the prospect of uncollectible judgments.  In attempting to reduce the cost of medical malpractice insurance in MICRA, the Legislature enacted a variety of provisions affecting doctors, insurance companies and malpractice plaintiffs." (*Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 158-159 (*Fein*).)

In the years since MICRA was enacted, the California Supreme Court has rejected constitutional challenges to a number of its provisions.  (See *American Bank*, *supra*, 36 Cal.3d 359 [Code Civ. Proc., § 667.7, which regulates payment of future damages awards, does not violate due process, equal protection or the right to a jury trial]; *Barme v. Wood* (1984) 37 Cal.3d 174 [Civ. Code, § 3333.1, which limits collateral source recovery from malpractice defendants, does not violate due process]; *Roa v. Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920 [Bus. & Prof. Code, § 6146, which caps attorney fee recovery in malpractice cases, does not violate due process]; *Fein*, *supra*, 38 Cal.3d 137 [Civ. Code, § 3333.2, which does not violate due process or equal protection].)  Plaintiffs, however, contend that our Supreme Court has not addressed the precise claims they raise.  Accordingly, we will address each claim.

*C. Right to Jury Trial*

Article I, section 16 of the California Constitution states in pertinent part: "Trial by jury is an inviolate right and shall be secured to all . . . ." Plaintiffs contend that this means that in any action in which a jury trial was available at common law, such as an action for personal injury, the court may not override a jury's factual finding that the plaintiff suffered a particular dollar amount in noneconomic damages. They also contend that in an action triable by jury at common law, the Legislature has no authority to limit the plaintiff's recovery by placing a cap on noneconomic damages.

In California, the right to a jury trial applies in any action in which the parties would have had the right to a jury trial under the common law as it existed in 1850, when the California Constitution was adopted. (*People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 286-287.) However, the right to a jury trial in a civil case is not immutable, even if the right existed at common law, nor is the scope of the constitutional right as sweeping as plaintiffs contend. The word "inviolate" "connotes no more than freedom from *substantial* impairment." (*People v. Peete* (1921) 54 Cal.App. 333, 364.) Deviations from the right as it existed at common law are permissible as long as there is no impairment of the "substantial features" of a jury trial. (*Jehl v. Southern Pacific Co.* (1967) 66 Cal.2d 821, 828-829 (*Jehl*).) For example, in *American Bank*, *supra*, 36 Cal.3d 359, the court rejected the contention that MICRA's provision for periodic payments (Code Civ. Proc., § 667.7) impermissibly infringes the right to a jury trial because at common law a personal injury plaintiff received his or her damages in a lump sum. The plaintiff's contentions in *American Bank* were based on the premise that periodic

7

payments may deprive the plaintiff, or the plaintiff's estate, of the full amount of future damages found by the jury because the payments cease upon the plaintiff's death. (*American Bank*, at pp. 366, 374-377.)  The court held that although the constitution required that the jury determine the amount of future damages, "the court's authority under [Code of Civil Procedure] section 667.7, subdivision (b)(1), to fashion the details of a periodic payment schedule does not infringe the constitutional right to jury trial." (*American Bank*, at p. 376.)  *American Bank* thus stands for the proposition that the Legislature may enact measures which may have the effect of limiting a medical malpractice plaintiff's recovery of the amount of damages awarded by the jury. Accordingly, we reject plaintiffs' contention that because juries were the sole arbiters of damages at common law, any limitation on that function violates the constitutional guarantee of a jury trial.

Moreover, even if a right to a jury trial in a particular context existed at common law, it may be modified in furtherance of a legitimate state interest:  "While the general propriety of noneconomic damages is 'firmly imbedded in our common law jurisprudence [citation],' no California case 'has ever suggested that the right to recover for such noneconomic injuries is constitutionally immune from legislative limitation or revision.  [Citation.]'  ([*Fein*], *supra*, 38 Cal.3d at pp. 159-160.)"  (*Yates v. Pollock* (1987) 194 Cal.App.3d 195, 200.)  On the contrary, the California Supreme Court has repeatedly held that "the Legislature retains broad control over *the measure . . .* of damages that a defendant is obligated to pay and a plaintiff is entitled to receive, and that [it] may expand or limit recoverable damages so long as its action is rationally related to

8

a legitimate state interest." (*Fein*, *supra*, 38 Cal.3d at p. 158 and cases cited therein; see also *American Bank*, *supra*, 36 Cal.3d at pp. 368-369 ["a plaintiff has no vested property right in a particular measure of damages, and . . . the Legislature possesses broad authority to modify the scope and nature of such damages" so long as the legislation is rationally related to a legitimate state interest].) Indeed, in *Werner v. Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, the court held that the Legislature may place a limit on the damages available in a cause of action, even though no such limit existed at common law, and may even abolish a cause of action which existed at common law. "To hold otherwise would result in freezing the law . . . as it was when the constitutional provision was originally adopted . . . ." (*Id.* at p. 124.)[3]

In *Fein*, *supra*, 38 Cal.3d 137, after noting the Legislature's broad authority to determine the measure of damages available in a cause of action, the court held that section 3333.2 does not violate due process because the cap is rationally related to a legitimate state interest. (*Fein*, at pp. 158-159.) Relying on *Fein*'s due process analysis, the court in *Yates*, *supra*, 194 Cal.App.3d 195, rejected the contention that section 3333.2 unconstitutionally abridges the right to a jury trial. Rather, the court held, the argument "is but an indirect attack upon the Legislature's power to place a cap on damages."

---

[3] We acknowledge that courts in other states which provide a constitutional right to jury trial similar to ours have held that allowing a legislature to place a cap on the amount of damages means that the right to a jury trial is directly and impermissibly subject to legislative limitation. (See, e.g., *Watts ex rel. Watts v. Lester E. Cox Med. Ctrs.* (2012) 376 S.W.3d 633, 642 [Missouri].) As we have discussed above, our Supreme Court clearly disagrees. (*Fein*, *supra*, 38 Cal.3d at pp. 158-159 and cases cited therein.)

9

(*Yates*, at p. 200.)  The court held that even though section 3333.2 will in some cases result in the recovery of a lower judgment than would have been obtained before the enactment of the statute, the cap does not violate a plaintiff's right to a jury determination as to noneconomic damages.  (*Yates*, at p. 200; accord, *Stinnett v. Tam* (2011) 198 Cal.App.4th 1412, 1433.)[4]  We agree with *Yates*' reasoning.  Moreover, even though it is true that the California Supreme Court has not engaged in an analysis of a contention that section 3333.2 violates a constitutional right to an award of the full amount of noneconomic damages as determined by a jury, the court has stated that section 3333.2 "places no limit on the amount of injury sustained by the plaintiff, as assessed by the trier of fact, but only on the amount of the defendant's liability therefor."  (*Salgado v. County of Los Angeles* (1998) 19 Cal.4th 629, 640.)  Because the court was not addressing the constitutionality of section 3333.2, this statement is properly viewed as dictum with respect to that issue.  Nevertheless, we find it highly persuasive of the court's view of the effect of section 3333.2 on a plaintiff's constitutional right to the full measure of noneconomic damages found by the jury, as that issue was analyzed in *Yates.*

---

[4] Plaintiffs also argue that *Yates* and *Stinnett* are inapposite because both involved actions for wrongful death, which, they assert, is not a cause of action recognized at common law, thus giving rise to a constitutional right to a jury trial.  The California Supreme Court has held that although the cause of action for wrongful death may have existed at common law, it is nevertheless deemed to be purely a creature of statute in California, created by the Legislature in 1862.  (*Justus v. Atchison* (1977) 19 Cal.3d 564, 572-575, overruled on another point in *Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 171.)  However, the California Supreme Court has also held that wrongful death actions *do* fall into the category of "actions for damages that would have been tried to a jury at common law."  (*Ruiz v. Podolsky* (2010) 50 Cal.4th 838, 853.)  In any event, neither *Yates* nor *Stinnett* based its analysis on the premise that the parties did not have a common law right to a jury trial.

10

Accordingly, we conclude that the MICRA cap does not improperly interfere with a jury verdict on noneconomic damages.

Plaintiffs assert that *Feltner v. Columbia Pictures Tel.* (1998) 523 U.S. 340 (*Feltner*) is dispositive. Plaintiffs cite that case as holding that "damages [are] peculiarly within the province of the jury," and that any interference with a jury's determination of damages violates the Seventh Amendment. We disagree, for two reasons. First, *Feltner* concerns the Seventh Amendment right to jury trial. That amendment is not applicable to the states (*McDonald v. City of Chicago* (2010) 561 U.S. ____ [130 S.Ct. 3020, 3024-3035, fn. 13]; *Jehl, supra*, 66 Cal.2d at p. 827), and it "differs significantly in language" from the jury trial guarantee in the California Constitution. (*Jehl*, at p. 827.) Second, *Feltner* does not address the constitutionality of a statutory cap on damages. Rather, the issue in *Feltner* is whether title 17 of the United States Code, section 504(c), a part of the Copyright Act of 1976, violates the Seventh Amendment right to a jury trial because it expressly provides for a determination of damages by a court rather than a jury. Section 504(c) "permits a copyright owner 'to recover, instead of actual damages and profits, an award of statutory damages . . . , in a sum of not less than $500 or more than $20,000 as the court considers just.'" (*Feltner, supra*, 523 U.S. at p. 342.) The court held that because the common law provided for recovery of damages for copyright infringement and provided for a jury determination of such damages, section 504(c) is unconstitutional unless it is construed to permit a jury trial to determine statutory damages. (*Feltner*, at pp. 342, 347-355.) Accordingly, *Feltner* does not assist us in resolving the issue before us, even by analogy.

11

*D. Separation of Powers*

Plaintiffs next contend that section 3333.2 violates the separation of powers doctrine embodied in article III, section 3 and article VI, section 1 of the California Constitution. Plaintiffs note that the California Supreme Court has not yet addressed this issue.

Plaintiffs are correct that the court has not explicitly framed a holding concerning section 3333.2 in terms of separation of powers. Nevertheless, in *Fein*, the court reiterated prior holdings that "the Legislature retains broad control over *the measure*, as well as *the timing*, of damages that a defendant is obligated to pay and a plaintiff is entitled to receive, and that the Legislature may expand or limit recoverable damages so long as its action is rationally related to a legitimate state interest." (*Fein*, *supra*, 38 Cal.3d at p. 158.) The court went on to state, "[W]e know of no principle of California—or federal—constitutional law which prohibits the Legislature from limiting the recovery of damages in a particular setting in order to further a legitimate state interest." (*Id*. at p. 161.) We are not persuaded by plaintiffs' arguments to the contrary.

*E. Equal Protection*

The California Constitution provides that "A person may not be . . . denied equal protection of the laws." (Cal. Const., art. I, § 7(a).) The Fourteenth Amendment contains a similar provision. (U.S. Const., 14th Amend.) Plaintiffs contend that section 3333.2 violates this constitutional guarantee because it "arbitrarily and irrationally singles out the most severely injured victims of medical malpractice for unfavorable treatment." Furthermore, they contend, "even if the MICRA cap served a rational purpose when it

12

was enacted, it is no longer needed, it is no longer rational and, therefore, it is no longer constitutional."

"'"[I]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. [Citations.] Where there are 'plausible reasons' for [the classification] 'our inquiry is at an end.'" [Citations.] Past decisions also establish that, under the rational relationship test, the state may recognize that different categories or classes of persons within a larger classification may pose varying degrees of risk of harm, and properly may limit a regulation to those classes of persons as to whom the need for regulation is thought to be more crucial or imperative. [Citations.]'" (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 481-482, italics omitted.)

In *Fein*, *supra*, 38 Cal.3d 137, our Supreme Court applied this rational basis inquiry and concluded that the statutory classifications created by section 3333.2 are rationally related to the legislative purposes of MICRA. First, the distinction between medical malpractice plaintiffs and other tort victims is rationally related to the legislative purpose of responding to an insurance crisis in that particular area. (*Id*. at p. 162.) Second, the differential impact of the $250,000 cap among subclasses of medical malpractice plaintiffs is also rationally related to the objective of reducing the costs of defendants and their insurers. (*Ibid***.**) In this regard, the court underscored that "the Legislature clearly had a reasonable basis for drawing a distinction between economic and noneconomic damages, providing that the desired cost savings should be obtained

13

only by limiting the recovery of noneconomic damage." (*Ibid*.) The court noted that there are inherent difficulties in placing a monetary value on losses for such intangible injuries, that money damages are imperfect compensation for such injuries, that such damages are generally passed on to and borne by innocent consumers, and that the right to recover damages for noneconomic injuries is not "constitutionally immune from legislative limitation or revision." (*Id*. at pp. 159-160.)

Fein expressly holds that the statutory classifications created by section 3333.2 "are rationally related to the 'realistically conceivable legislative [purposes]' [citation] of MICRA." (*Fein*, *supra*, 38 Cal.3d at p. 163.) As the *Fein* court cautioned, we may not "properly strike down a statute simply because we disagree with the wisdom of the law or because we believe that there is a fairer method for dealing with the problem. [Citation.] . . . . '[A] court cannot eliminate measures which do not happen to suit its tastes if it seeks to maintain a democratic system. The forum for the correction of ill-considered legislation is a responsive legislature.'" (*Id*. at pp. 163-164.) Decisions of the California Supreme Court "are binding upon and must be followed by all the state courts of California." (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Because plaintiffs' first equal protection argument was rejected in *Fein*, we also must reject it.

14

Plaintiffs' argument that conditions have changed since *Fein* was decided in 1985 and that section 3333.2 is no longer rationally related to a legitimate state interest was rejected in *Stinnett*, *supra*, 198 Cal.App.4th at pages 1428 through 1432. We agree with that court's reasoning and need not repeat it at length here. In essence, *Stinnett* holds that except in narrow circumstances which do not exist with respect to section 3333.2, it is not the judiciary's function to determine when constitutionally valid legislation has served its purpose. (*Stinnett*, at pp. 1430-1431.) For this reason, we decline plaintiffs' request that we remand the matter to the trial court for further litigation as to the continued viability of section 3333.2.

2.

CALCULATION OF THE OFFSET FROM THE SETTLEMENT WITH DESERT
REGIONAL MEDICAL CENTER

Before trial, plaintiffs settled with former defendant Desert Regional Medical Center for $3,000,000.[5] The trial court found the settlement to be in good faith. On motion of defendant, the trial court applied the settlement to offset the judgment. Plaintiffs concede that an offset was required but contend that the trial erred with respect to the principles it applied with respect to the offset, as we discuss below.

---

[5] The plaintiffs' settlement with the hospital was confidential, and the settlement agreement itself is not contained in the record on appeal. Defendant states that the settlement did not differentiate between economic and noneconomic damages. Plaintiffs refer to the settlement as a lump sum and do not otherwise describe its terms. From these statements, we infer that the settlement also did not differentiate between the claim of Trent Hughes and the claim of Lisa Hughes.

15

*A. The Applicable Law*

Code of Civil Procedure section 877 provides that when one or more tortfeasors "claimed to be liable for the same tort" enters into a good faith settlement with the plaintiff, the settlement "shall have the following effect:  [¶]  (a)  It shall not discharge any other such party from liability unless its terms so provide, *but it shall reduce the claims against the others in the amount stipulated by the release*, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater.  [¶]  (b)  It shall discharge the party to whom it is given from all liability for any contribution to any other parties."  (Code Civ. Proc., § 877, italics added.)

Prior to the enactment of section 1431.2, tortfeasors were jointly and severally liable for both economic and noneconomic damages.  In 1986, the electorate adopted Proposition 51, which altered the long-standing doctrine of joint and several liability.  (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1192-1193.)  Section 1431.2, which was enacted pursuant to Proposition 51, provides, in pertinent part:  "(a)  In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint.  Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."  (§ 1431.2, subd. (a).)  Because each defendant is now solely responsible for his or her share of the noneconomic damages, to allow an offset for the portion of a settlement which is designated for noneconomic damages would, in effect,

16

cause money paid in settlement of a several liability to be treated as if it were paid as a joint liability. Accordingly, except as we discuss below, any portion of a settlement attributable to noneconomic damages is not available to offset the judgment against a nonsettling defendant. (*Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 274-275, 276-277 (*Espinoza*).)

If the pretrial settlement does not differentiate between economic and noneconomic damages, offset against the later judgment is calculated in proportion to the ratio of economic to noneconomic damages awarded by the trier of fact and in proportion to the nonsettling defendant's percentage of fault. (*Espinoza*, *supra*, 9 Cal.App.4th at pp. 276-277; *Wilson v. John Crane*, *Inc.* (2000) 81 Cal.App.4th 847, 864.)

*B. Application to This Case*

The trial court calculated the offset as follows: It first applied the MICRA cap on plaintiffs' noneconomic damages and deducted $500,000 from the $3,000,000 settlement. It also deducted $125,000, the award for Trent's past lost earnings, and an additional $500,000, the present value of Trent's lost future earnings. This left a settlement balance of $1,850,000,[6] which the court then applied as an offset against Trent's future damages.

Plaintiffs argue that this was incorrect because it fails to apply the *Espinoza* calculus, because the court was required to calculate the ratio of economic to noneconomic damages before it applied the MICRA cap, and because the court should first have applied an *Espinoza*-style calculus to determine the portion of the settlement

---

[6] This was the amount reflected in the court's ruling. The correct balance under the court's calculation is $1,875,000.

17

which constituted Lisa's damages. They point out that Lisa's damages, for loss of consortium, were entirely noneconomic and should therefore not have been used to offset Trent's economic damages. Defendant contends that the trial court properly applied the MICRA cap to the noneconomic damages before determining the offset and that the court implicitly recognized that *Espinoza*, which is not a medical malpractice case, does not apply to medical malpractice cases because it results in an award of noneconomic damages in excess of the MICRA cap. We agree with both parties, in part.[7]

The jury assessed the damages as follows:

Trent Hughes:

| | |
|---|---|
| Past economic loss: | |
| Lost earnings: | $ 125,000 |
| Future economic loss: | |
| Lost earnings: | |
| Future value: | $ 1,400,000 |
| Present cash value: | $ 500,000 |
| Life care plan expenses: | |
| Future value: | $11,200,000 |
| Present cash value: | $ 4,000,000 |
| Past noneconomic loss: | $ 750,000 |
| Future noneconomic loss: | $ 2,000,000 |

Lisa Hughes:

| | |
|---|---|
| Noneconomic damages: | $ 1,000,000[8] |

---

[7] The proper calculation of the offset is a question of law which we review independently. (See *Francies v. Kapla* (2005) 127 Cal.App.4th 1381, 1386.)

[8] The special verdict did not ask the jury to determine the present value of Trent's future noneconomic damages, nor did it ask the jury to allocate Lisa's damages between past and future or to set present and future values for Lisa's damages. For purposes of calculating the ratios, we will assume that Trent's future noneconomic damages and all of Lisa's noneconomic damages are stated as present value.

18

We first address the question of apportioning the settlement to account for Lisa's damages for loss of consortium. Loss of consortium is expressly included in section 1431.2 as an item of noneconomic damages. (§ 1431.2, subd. (b)(2).) Loss of consortium may, however, in some cases include the cost of obtaining substitute domestic services and, in such a case, would therefore constitute economic damages, at least in part. (*Kellogg v. Asbestos Corp. Ltd.* (1996) 41 Cal.App.4th 1397, 1408; § 1431.2, subd. (b)(1).) However, Lisa's testimony did not include any claim for such costs, and the special verdict expressly stated her damages in terms of "the loss of her husband's love, companionship, comfort, care, assistance, protection, affection, society, moral support, and the loss of the enjoyment of sexual relations." Accordingly, all of Lisa's damages were noneconomic. That being the case, her damages could not be applied to offset the economic damages verdict and therefore "should have been excluded entirely from the *Espinoza* calculus." (*Wilson v. John Crane*, *Inc.*, *supra*, 81 Cal.App.4th at pp. 863-864.) Moreover, as plaintiffs point out, the jury awarded separate damages for Trent's and Lisa's separate causes of action, but the trial court treated the judgment as though damages were awarded to plaintiffs jointly. We are not aware of any authority permitting the use of damages awarded to one plaintiff to offset damages awarded to another.

Accordingly, the portion of the settlement attributable to Lisa's damages should have been deducted from the settlement prior to apportioning the balance of the settlement between Trent's economic and noneconomic damages. Lisa's damages of $1,000,000 equal 11.94 percent of the plaintiffs' total damages. 11.94 percent of $3,000,000 is $358,200. ($1,000,000 ÷ 8,375,000 = .1194; .1194 x 3,000,000 = $358,200.) The remaining balance of the settlement is $2,641,800.

Applying *Espinoza* to calculate the offset against Trent's economic damages yields the following: Trent's total damages, reduced to present value (see fn. 7, above), are $7,375,000. His economic damages ($4,625,000) constitute 62.71 percent of that amount. 62.71 percent of $2,641,800 equals $1,656,673. (4,625,000 ÷ 7,375,000 = .6271; .6271 x 2,641,800 = 1,656,673.) (All amounts are rounded to the nearest dollar.) Offsetting Trent's economic damages by that amount, however, leaves a settlement balance of $985,127 attributable to Trent's noneconomic damages. That amount exceeds the MICRA cap, as does the portion of the settlement attributable to Lisa's damages ($358,200). Under *Espinoza* and under section 1431.2, that balance cannot be applied to offset the judgment for economic damages. But allowing plaintiffs to retain those amounts violates section 3333.2.

For this reason, defendant contends that the *Espinoza* calculus does not apply to a settlement involving the MICRA cap. (As noted above, *Espinoza* itself is not a MICRA case.) Defendant contends that reducing Trent's noneconomic damages to the MICRA cap of $250,000 before calculating the ratio of economic to noneconomic damages, as the trial court did, eliminates this problem. He relies on *Mayes v. Bryan* (2006) 139

20

Cal.App.4th 1075. In *Mayes*, the court held that where two or more defendants are subject to the MICRA cap, the court should apply the cap to reduce the award of noneconomic damages before engaging in the *Espinoza* calculus. (*Id.* at pp. 1098-1103.) In *Francies v. Kapla*, *supra*, 127 Cal.App.4th 1381, on the other hand, the court held that the cap should be applied after the court determines the ratio of economic to noneconomic damages. In that case, however, only the nonsettling defendant was a health care provider subject to MICRA. The settling defendant was the plaintiff's former employer. (*Francies v. Kapla*, at pp. 1383-1384.) Because MICRA did not apply to the settlement with the employer, the court held, it did not serve the purpose of sections 3333.2 or 1431.2 to reduce the noneconomic damages to $250,000 before calculating the ratio of economic to noneconomic damages. (*Id.* at pp. 1385-1389.) Here, *Mayes* applies, and it produces a result in keeping with the intent of MICRA.

If plaintiffs' noneconomic damages are reduced prior to applying *Espinoza*, the total judgment is $5,125,000 ($4,625,000 + $500,000). Lisa's percentage of the judgment is .04878. (250,000 ÷ 5,125,000 = .04878.) The portion of the settlement attributable to Lisa's damages is $146,340. (.04878 x 3,000,000 = 146,340.) Deducting Lisa's share leaves a settlement balance of $2,853,660. The total judgment for Trent's economic and noneconomic damages is $4,875,000 ($250,000 + $4,625,000). The percentage of the total judgment attributable to Trent's economic damages is .94871. (4,625,000 ÷ 4,875,000 = .94871.) The portion of the settlement available to offset Trent's economic damages is $2,707,296. (2,853,660 x .94871 = 2,707,296.) This leaves a settlement balance of $146,364 attributable to Trent's noneconomic damages and does

21

not leave any portion of the settlement funds which is not attributable to economic damages or which exceeds the MICRA cap.

This approach eliminates the problem which arises when the MICRA cap is not applied before determining the ratio of economic to noneconomic damages, as we have discussed above. It does not, however, solve the remaining problem, which is how to apportion the noneconomic damages between the hospital and Dr. Pham.

Defendant did not present any evidence on apportionment of fault between himself and the hospital, and the jury was not asked to apportion fault. In *Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, the court held that a defendant who fails to meet his or her burden of proof on the apportionment of fault is liable for all of the plaintiff's noneconomic damages with no offset for the plaintiff's settlement with another tortfeasor, even if that would result in the plaintiff's net recovery of noneconomic damages in excess of the amount awarded at trial. (*Id.* at pp. 67-68.) The court reasoned, "'[S]ettlement dollars are not the same as damages. Settlement dollars represent a contractual estimate of the value of the settling tortfeasor's liability and may be more or less than the proportionate share of the plaintiff[']s damages. The settlement includes not only damages, but also the value of avoiding the risk, expense, and adverse public exposure that accompany going to trial. There is no conceptual inconsistency in allowing a plaintiff to recover more from a settlement or partial settlement than he could receive as damages. [Citations.]'" (*Ibid.*) Because *Hoch* is not a medical malpractice case, however, the court was not required to address the effect of MICRA. MICRA compels a different result.

22

The purpose of the cap on noneconomic damages provided for in section 3333.2 is "to reduce the cost of medical malpractice litigation, and thereby restrain the increase in medical malpractice insurance premiums." (*Fein*, *supra*, 38 Cal.3d at p. 159.) In furtherance of that purpose, the statute establishes the limit which a plaintiff may receive for a single injury, regardless of the number of health care providers who are in some degree liable for that injury. (*Gilman v. Beverly California Corp*. (1991) 231 Cal.App.3d 121, 128.) Because section 3333.2 bars any medical malpractice plaintiff from recovering more than $250,000 from any number of health care providers, it necessarily *requires* a court to apply settlement dollars for noneconomic damages to a subsequent judgment for such damages, unless the settlement and the judgment combined do not exceed $250,000.

"To the extent a specific statute is inconsistent with a general statute potentially covering the same subject matter, the specific statute must be read as an exception to the more general statute." (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 857.) Because section 3333.2 places a cap on the total recovery of noneconomic damages from health care providers, it is the more specific statute, and we read it as an exception to section 1431.2.[9]

---

[9] Whether MICRA operates as an exception to the bar created by section 1431.2 is currently on review before the California Supreme Court in *Rashidi v. Moser*, review granted January 15, 2014, S214430.

Accordingly, we conclude that the judgment for Trent's economic damages is to be offset by $2,707,296, and the judgment for his noneconomic damages is to be offset by $146,364. The judgment for Lisa's damages is to be offset by $146,340.

3.

PERIODIC PAYMENTS

Upon the request of a party in a personal injury action in which future damages of $50,000 or more are awarded, the court may order the judgment paid in whole or in part by periodic payments rather than a lump sum. (Code Civ. Proc., § 667.7, subd. (a).)

Here, the court ordered Trent's future economic damages paid over 18 years. It ordered an initial double payment of $626,315, followed by 17 annual installments of $313,158.[10] Plaintiffs contend that the order was erroneous because the court gave defendant a dollar-for-dollar credit for the settlement with Desert Regional Medical Center, even though only a percentage of the settlement was attributable to economic damages, and because the court reduced Trent's future damages to present value and then ordered payment over 18 years.

The legislative purpose behind Code of Civil Procedure section 667.7 is as follows: "By authorizing periodic payment judgments, it is the . . . intent of the Legislature that the courts will utilize such judgments to provide compensation sufficient

---

[10] There is substantial evidence that Trent's life expectancy from the time of trial was 19 years. The court initially ordered 19 equal annual payments, then modified the judgment to provide for a initial double payment to cover attorney fees and costs, followed by 17 equal annual payments. Plaintiffs do not object to the payment schedule; they object only to the amount of the payments.

24

to meet the needs of an injured plaintiff and those persons who are dependent on the plaintiff for whatever period is necessary while eliminating the potential windfall from a lump-sum recovery which was intended to provide for the care of an injured plaintiff over an extended period who then dies shortly after the judgment is paid." (Code Civ. Proc., § 667.7, subd. (f).) The fundamental goal is to match losses with compensation as the losses occur. (*Salgado v. County of Los Angeles*, *supra*, 19 Cal.4th at pp. 638, 640.) When an award of future damages is to be paid over a period of years, the plaintiff is entitled to periodic payments based on the gross award of future damages, not on the present value. "'This is because if a present value award is periodized, a plaintiff might not be fully compensated for his or her future losses; the judgment, in effect, would be discounted twice: first by reducing the gross amount to present value and second by deferring payment.'" (*Id.* at p. 639.)

As we have discussed above, plaintiffs are correct that the court erred with respect to its treatment of the settlement to offset the judgment. Contrary to plaintiffs' other contention, however, the trial did not base the award of periodic payments on the current value of Trent's future damages.

The trial court arrived at the sum to be converted to periodic payments as follows: The court deducted Trent's lost past earnings ($125,000), the present value of Trent's lost future earnings ($500,000) and both plaintiffs' noneconomic damages ($500,000) from the $3 million settlement, leaving a settlement balance of $1,850,000 to be offset against future damages. The court concluded that it could not deduct the present value of the settlement proceeds from the future value of Trent's damages ("apples and oranges").

25

The court reduced Trent's future damages of $11.2 million to the present value determined by the jury, $4 million. The court found that this was a ratio of 2.8 to 1. It then subtracted $1,850,000 from the present value of Trent's future damages ($4,000,000) and multiplied the balance ($2,125,000) by 2.8, arriving at $5,950,000 as the amount of future damages to be converted to periodic payments.[11] Accordingly, although the court first reduced the future damages to present value, its final award represents the future value of the damages less the future value of the settlement proceeds. Because the trial court's calculation of the periodic payments is founded on its erroneous treatment of the settlement agreement, as we have discussed above, however, we will remand the matter to the trial court with directions to recalculate the periodic payments in a manner consistent with this opinion.[12]

4.

THE SUFFICIENCY OF THE UNDERTAKING

Finally, plaintiffs contend that the trial court allowed defendant to appeal without posting a sufficient undertaking. Because we are remanding for recalculation of the offset and the periodic payment amount, this issue is moot. (*City of Lodi v. Randtron* (2004) 118 Cal.App.4th 337, 362-363.) Should there be a subsequent appeal, the parties may revisit the appropriate amount of undertaking.

---

[11] Either the court's arithmetic was faulty or its ruling contains two typographical errors. Subtracting $1,125,000 from $3,000,000 leaves $1,875,000, not $1,850,000. And, subtracting $1,850,000 from $4,000,000 leaves $2,150,000, not $2,125,000.

[12] We will address defendant's contentions concerning the periodic payments, raised in his cross-appeal, below.

26

1.

## SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING

## THAT DEFENDANT'S NEGLIGENCE WAS A SUBSTANTIAL

## FACTOR IN HUGHES' INJURY

Defendant contends that there was no evidence that any negligence on his part caused plaintiffs' damages because all of the experts agreed that Trent Hughes would have been rendered paraplegic by an independent thoracic/cervical spinal injury regardless of the L1 injury and because plaintiffs offered no evidence that defendant could have done anything to alter that outcome.

As a threshold issue, the parties disagree about just what plaintiffs were required to prove in order to meet their burden of proof as to causation. Defendant contends that plaintiffs had the burden to prove that but for defendant's negligence, the harm would not have occurred. Plaintiffs contend that the "but for" test does not apply and that their burden was to prove that defendant's negligence was a substantial factor in causing their damages. Defendant responds that the jury was instructed to apply the "but for" test and that plaintiffs are in error in asserting that "substantial factor" is the standard for medical malpractice cases. Both are partly correct.

In a medical malpractice action, the plaintiff must produce sufficient evidence to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability that the plaintiff would have obtained a better result. (*Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304, 1314-1315.) The

27

defendant's negligence need not be the sole cause of the plaintiff's damages; it is sufficient that the defendant's negligence was a substantial factor in bringing about the harm suffered by the plaintiff. (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1049.) The "substantial factor" test subsumes the "but for" test: "'If the conduct which is claimed to have caused the injury had nothing at all to do with the injuries, it could not be said that the conduct was a factor, let alone a substantial factor, in the production of the injuries.'" (*Id.* at p. 1052.) Stated another way, if the same harm would have resulted even if the defendant had not acted negligently, the defendant's conduct is not a substantial factor in causing that harm. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1239-1240.) CACI No. 430, which the court used in this case, reflects this. It provides: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] [Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.]" (CACI No. 430.)

Here, there was arguably more than one cause for Trent's injuries: the accident itself, defendant's negligence, and subsequent complications which might have arisen even if defendant had acted promptly to stabilize the L1 fracture. (We discuss this below.) Accordingly, plaintiffs were required to prove that defendant's conduct was a substantial factor in causing their damages.

28

We apply the substantial evidence rule.[13] "'Where findings of fact are challenged on a civil appeal . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted'" to support the finding below. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053, citation omitted.) Substantial evidence is "evidence . . . 'of ponderable legal significance, . . . reasonable in nature, credible, and of sold value.'" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873, citations and italics omitted.) In determining whether substantial evidence supports a factual finding, we review the entire record. (*Ibid*.) We review the record in the light most favorable to the prevailing party, giving that party the benefit of every favorable inference and resolving all conflicts in its favor. (*Bickel v. City of*

---

[13] Defendant does not state the standard of review. The standard of review is crucial to a reviewing court's analysis, and failure to acknowledge the proper scope of review may be deemed a concession of a lack of merit. (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.) Moreover, a defendant who asserts that a judgment is not supported by substantial evidence must set forth all of the material evidence on the point in question, not just the evidence which favors his position. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) When the defendant's brief states only the favorable facts, the appellate court may treat the issue as waived and presume that the record contains evidence sufficient to sustain every finding of fact. (*Arechiga v. Dolores Press, Inc.* (2011) 192 Cal.App.4th 567, 571-572; *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409-410.) Here, defendant does not state the facts favorable to the judgment and states only those favorable to his position. For this reason as well, we would be acting within the scope of our discretion simply to disregard defendant's contention. Nevertheless, we choose to address the merits of the issue.

We disregard plaintiffs' contention that defendant waived review because he did not assert the insufficiency of the evidence in a motion for new trial. Plaintiffs do not cite any relevant authority that a new trial motion is a necessary prerequisite to raising the sufficiency of the evidence on appeal, and we are aware of none. On the contrary, the sufficiency of the evidence may always be raised for the first time on appeal. (*Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23 & fn 17.)

*Piedmont*, at p. 1053.)  If there is substantial evidence which supports the disputed finding, the judgment will be upheld even though substantial evidence to the contrary also exists and the trier of fact might have reached a different conclusion had it believed other evidence.  (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)

Here, defendant asserts that all of the expert witnesses agreed that Trent Hughes had suffered injury to his thoracic spine at T1 in addition to the lumbar injury and that all agreed that these injuries were caused by the accident.  However, it is simply not the case, as defendant asserts, that even plaintiffs' experts agreed that "the T1 injury paralyzed plaintiff, notwithstanding Dr. Pham's treatment or the L1 injury."

Defendant's contention is based on the testimony of his expert, Dr. Hesselink, a neuroradiologist.  Dr. Hesselink studied all of Trent's medical records and the reports and depositions of other expert witnesses in this case.  Dr. Hesselink testified that when Trent left Desert Regional Medical Center and was transferred to a hospital in Arizona,[14] the level of his injury was L1, meaning that he had no sensory or motor function below that level.  Dr. Hesselink testified that Trent's medical records showed that in the accident on November 2, 2003, he also sustained a fracture at T4, one which was not clinically significant.[15]  While Trent was being treated at hospitals in Arizona, however, "his deficit was changing . . . [and] was ascending above L1 eventually reaching up to C7, T1" or C8.

---

[14]  Plaintiffs reside in Arizona.

[15]  Drs. Coufal and Moser, expert witnesses who testified for plaintiffs, agreed that the thoracic compression fracture sustained during the accident was not medically significant and required no treatment.

There was also swelling of the spinal cord from C6 down to T5. Dr. Hesselink opined that the swelling showed a spinal cord infarct. He explained that an infarct results when insufficient blood and oxygen reach tissues. The spinal cord was normal size below T5, and the main area of swelling was in the upper thoracic area of T2 to T5. He believed that some of the arteries that supply the spinal cord at that level were damaged in the accident. After the transfer to Arizona, Trent suffered complications. His hemoglobin was very low, he had a fever and he also had hypotension, or low blood pressure. All of those complications exacerbated the low blood and oxygen supply to the damaged thoracic vertebrae, resulting in infarction at the T1 level. The result of the infarct was that the spinal tissue degenerated and died, resulting in an irreversibly atrophied spinal cord. If atrophy is total, there is no function.

An MRI done on December 1, 2005, a little more than two years after Trent's accident, showed severe cord atrophy at C7, T1. It also showed severe atrophy in the lower thoracic spine, just above L1. Dr. Hesselink testified that the entire spinal cord between T1 and L1 was abnormal and had no function. He stated that the atrophy at T1 was not caused by the accident. Rather, it resulted from the complications which arose several weeks after the accident. If plaintiff had had a contusion at T1 resulting from the accident, he would have had problems above L1 before the second or third week of his hospitalization, when those complications arose. Dr. Hesselink testified that atrophy at T1, C7 would not affect Trent's use of his arms because the nerves which supply the arms come from elsewhere. The T1, C7 injury would affect only muscles on the side of the hand and the little finger. He opined that because the infarct and resulting cord

31

atrophy at T1 resulted in lack of sensory and motor function below that level, Trent would have been left paraplegic even if the L1 injury had not occurred.

It is unquestionable that Dr. Hesselink's testimony is substantial evidence on which the jury could have relied to reject plaintiffs' claim that defendant's negligence caused their damages. However, defendant is in error when he states that plaintiffs' experts agreed with Dr. Hesselink.

Defendant implies that Dr. Moser, plaintiffs' expert in neuroradiology, testified consistently with Dr. Hesselink that "given the severe cord atrophy at T1, plaintiff would have been in the same position even if the L1 burst fracture had never occurred because the spinal cord was destroyed at the level of T1." This is incorrect. Although Dr. Moser acknowledged that the radiological study conducted in 2005 showed atrophy at the T1 level, he said that such an injury might or might not affect function below that level. Moreover, Dr. Moser disagreed with Dr. Hesselink's assessment of the type of injury Trent sustained to his upper thoracic or cervical spine. Dr. Hesselink believed it was a spinal cord infarct; Dr. Moser described it as a contusion, i.e., a bruise. Dr. Moser did not agree with Dr. Hesselink that Trent would have been paralyzed because of the lesion in the thoracic/cervical spine regardless of the treatment of the L1 injury. He testified that if Trent had suffered the injury Dr. Hesselink described, Trent's arms would be very weak and that he would in all likelihood be a complete quadriplegic. Moreover, infarcts cause permanent damage. An infarct would be inconsistent with the testimony of Dr. Ladin, plaintiffs' spinal cord rehabilitation expert, who testified that although Trent had lost

32

hand strength, over a period of years he had regained normal strength. This would be a highly unusual outcome following an infarct.

Dr. Ladin testified that Trent's MRI done on November 26, 2003, showed a posttraumatic injury to the cervical spine which had previously gone unnoticed. (He later testified that the lesion first appeared during a study done in 2005.) He described it as a lesion at C5, C7. There was hemorrhage present which indicated a traumatic injury rather than an ischemic event or an infarct, both of which result from loss of blood supply to an affected area. This caused a transient loss of neurological function in the upper extremities. He testified that if Trent had suffered an infarct at C5, C6, C7 or C8, Trent would be a quadriplegic. An infarct is by definition a permanent injury. Accordingly, if the cervical injury had been an infarct, Trent could not have regained arm or hand function. At the time of the trial, however, Trent had normal function and strength in his hands, and he was routinely using his arms to move himself to and from his wheelchair.

Dr. Coufal, a neurosurgeon who testified for plaintiffs, also disagreed that Trent had suffered a cord infarct. An infarct is a sudden and catastrophic event; it does not come on gradually. Trent's medical records did not reflect any sudden and catastrophic change in his condition following his transfer to a hospital in Phoenix. Instead, he opined that the deterioration in Trent's condition, leading to weakness in his upper extremities, was the result of a syrinx, a cyst which can form when there are disturbances in the circulation of spinal fluid. The burst fracture at L1 caused such a disturbance because bone fragments pressing on the spinal cord were not removed during the surgery. Trent's syrinx was located in the high thoracic or lower cervical spine. A syrinx at that location

33

could cause loss of neurologic function in the arms as well as the lower extremities and torso. Dr. Coufal testified that because Trent ultimately regained arm and hand function, the deterioration he suffered was better explained by a syrinx than an infarct. Moreover, the scans performed on November 26, 2003, and in 2005 showed chronic bleeding in the low cervical/high thoracic region. Chronic hemorrhage is not consistent with an infarct, which results from *lack* of blood flow. Dr. Coufal opined that the hemorrhage was more consistent with consequences from the L1 injury. Finally, Dr. Coufal testified that if Trent had suffered an infarct in the low cervical/high thoracic region, he would have been left quadriplegic.

Moreover, both Dr. Coufal and Dr. Ladin testified that Trent, to a reasonable medical certainty, would have had a better outcome if defendant had operated promptly to stabilize the L1 injury, which both described as incomplete when Trent first arrived at Desert Regional Medical Center. Dr. Coufal testified that defendant's negligent response to Trent's condition allowed an incomplete spinal cord injury to progress to a complete spinal cord injury.[16] He testified that with an urgent decompression of the spinal cord at the signs that Trent's neurological condition was deteriorating, Trent had a chance of functional recovery. He testified that it was more probable than not that Trent would have had a return of sensation, a return of motor function, a return of bowel and bladder

---

[16] The reporter's transcript shows that Dr. Coufal said defendant's failure to act promptly "allow[ed] a complete [*sic*] spinal cord injury to progress to a complete spinal cord injury." This may be a transcription error. In any event, it is clear from the context that he meant to say that defendant's failure allowed an *incomplete* spinal cord injury to progress to a complete spinal cord injury.

function, and a partial recovery of sexual function if defendant had acted promptly and appropriately. Dr. Ladin testified to similar effect. In addition to a probable recovery of bowel, bladder and sexual function, Dr. Ladin also testified that with timely intervention, there was a high likelihood that Trent would have been able to walk again.

The foregoing is clearly substantial evidence the jury was entitled to find credible and which is sufficient to meet plaintiffs' burden to prove that defendant's negligence was a substantial factor in causing plaintiffs' damages. It is irrelevant that there was also evidence to the contrary. (*Howard v. Owens Corning*, *supra*, 72 Cal.App.4th at p. 631.)

2.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION

IN EXCLUDING TESTIMONY

Dr. Powell was the trauma surgeon who first examined Trent when he arrived in the emergency room at Desert Regional Medical Center.[17] Defendant wished to have her testify concerning Trent's condition upon his arrival, including her impression that Trent had lower extremity paralysis, which was reflected in the notes she dictated on November 3, 2003, the day after she examined Trent. Plaintiffs objected to her testimony on several grounds, including Dr. Powell's lack of expertise in neurology. Following a hearing pursuant to Evidence Code section 402, the court allowed her to testify concerning her examination of Trent and her objective observations, but excluded her conclusion concerning Trent's paralysis because she testified that assessment and

---

[17] By the time of trial, Dr. Powell had changed her name to Geisman. The parties refer to her as Dr. Powell.

35

diagnosis of spinal cord injuries was beyond her expertise. The court ordered Dr. Powell's dictated report redacted to excise the phrase "lower extremity paralysis." Defendant contends that this was reversible error.

Evidence Code section 720 provides: "(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert. [¶] (b) A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony."

"""The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown.""" (*People v. Davenport* (1995) 11 Cal.4th 1171, 1207, disapproved on another point in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) Here, defendant has not shown that the trial court abused its discretion. Dr. Powell stated unequivocally that she lacked expertise in the assessment and diagnosis of spinal cord injuries. The court's decision to limit her testimony to her examination procedure and her objective observations was not an abuse of discretion.

3.

SUBSTANTIAL EVIDENCE SUPPORTS THE AWARD FOR

FUTURE MEDICAL AND LIFE CARE COSTS

Defendant contends that the jury's award of $11,200,000 ($4,000,000 present value) for Trent's future medical and life care is excessive. He contends that the jury was required to select a life expectancy of 19 years or 30.9 years and either 12 hours or 24 hours a day of attendant care. He contends that none of the possible combinations of life expectancy and level of attendant care results in the amount awarded by the jury. He also contends that "plaintiff's level of paralysis does not require 24-hour per day attendant care."

As was the case with defendant's contention that the evidence did not support a finding of causation (*ante*, at pp. 26-35), defendant fails to state the standard of review. Arguments are to be tailored according to the applicable standard of review. Failure to acknowledge the proper scope of review may be seen as a concession that the argument lacks merit. (*Sonic Manufacturing Technologies*, *Inc. v. AAE Systems*, *Inc.*, *supra*, 196 Cal.App.4th at p. 465.) He also discusses only selected items of evidence and argues that they do not support the verdict. Failure to state the evidence in the light most favorable to the verdict is another valid reason to reject a substantial evidence question without analysis. (*Arechiga v. Dolores Press*, *Inc.*, *supra*, 192 Cal.App.4th at pp. 571-572.) Accordingly, we could simply disregard his argument all together. Instead, we will address defendant's arguments briefly.

37

First, contrary to defendant's contention, it was not undisputed that Trent's life expectancy was 19 years. Rather, the evidence showed that Trent's life expectancy ranged anywhere from 19 years to 35 years.

It is also not the case that the jury's award was necessarily based on 30.9 years, as defendant contends. The jury was not instructed that it had to choose between a life expectancy of 19 years and a life expectancy of 30.9 years. Rather, it was instructed to determine Trent's life expectancy based on any applicable considerations. A primary factor brought to the jury's attention which might affect Trent's actual longevity was the amount and quality of the care he received. Based on the report of plaintiffs' life care planner, their economist estimated that if Trent lived 19 years, 12 hours of care a day would cost $5,783,907, and 24 hours a day for 19 years would cost $8,771,032. At 30.9 years, the cost of his care at 12 hours a day would be $12,170,144, and at 24 hours a day for 30.9 years, the cost would be $18,300,019. The jury's award falls more or less in the middle of this range, apparently reflecting that the jury determined that Trent's life expectancy and life care needs fell somewhere in the middle of the spectrum established by the evidence.

As to defendant's contention that Trent does not require 24-hour a day attendant care, we note that the jury was not asked to return a special verdict stating the number of hours of care Trent required and we can therefore not assume that the award was based on that amount of care.

Because the evidence supports a range of life expectancies and future damages, including the amount awarded by the jury, we reject defendant's contention that the award was excessive.

Defendant also complains that the jury's calculation of the present value of the $11.2 million award was erroneous. He cites no authority as to how a jury is required to compute present value, and in any event his contention is based on an unwarranted assumption as to how the jury arrived at the future value. Moreover, according to defendant's calculation, the jury erroneously stated the present value to be approximately $600,000 *less* than it should have. If this was an error, defendant is not prejudiced by it.

4.

THE COURT'S ORDER FOR PERIODIC PAYMENTS

WAS WITHIN ITS DISCRETION

An order for periodic payments is reviewed for abuse of discretion. (*Salgado v. County of Los Angeles*, *supra*, 19 Cal.4th at p. 650.)

Defendant contends that the court abused its discretion in ordering 19 equal payments for several reasons. We see no abuse of discretion.

All of defendant's arguments are based on the assumption that the future damages award was necessarily based on a jury finding that Trent's life expectancy was 30.9 years. We have rejected this assumption and therefore need not address defendant's contentions concerning the periodic payments to the extent that they are based on that assumption.

39

We will address defendant's contention that it was an abuse of discretion to order equal annual payments. Defendant contends that the equal annual payments are an abuse of discretion because "[w]hile plaintiff's future medical costs remain relatively constant, inflation increases the actual price plaintiff will have to pay in the future." He points out that the economist calculated the current cost of 12 hours a day attendant care as $109,500 per year, but projected a total cost, over 30.9 years, of $6,129,876. Simply multiplying $109,500 by 30.9 years equals $3,383,550, reflecting that the economist included 30 years of inflation in her calculation.

Defendant relies on *Holt v. Regents of University of California* (1999) 73 Cal.App.4th 871. In that case, the court found that equal annual payments were an abuse of discretion because the evidence showed that the plaintiff's losses would be greater in her later years. The plaintiff's parents would continue to care for her as long as possible, thus minimizing her expenses in her earlier years. (*Id*. at p. 883.) Whether an order for equal periodic payments is an abuse of discretion, however, depends upon the specific facts of the individual case. In *Salgado v. County of Los Angeles*, *supra*, 19 Cal.4th 629, for example, the court held that equal annual periodic payments did not constitute an abuse of discretion because in that case, the evidence showed that although the value of the payments would decrease over time, the plaintiff's expenses would also decrease. Therefore, the payment schedule did not fail to satisfy the goal of Code of Civil Procedure section 667.7 of "matching losses with compensation as the losses occur." (*Salgado*, at p. 650.)

40

Here, the court found that "the only expert testimony concerning life expectancy was that plaintiff would likely live about 19 more years." It acknowledged, however, that the jury could have used a longer life expectancy in calculating the future value of life care expenses. The court recognized that if it did not apply "some sort of discount factor" there was a risk that the periodic payments would not cover Trent's future medical and life care needs some years in the future. However, the court concluded that the risk was outweighed by Trent's "need to make some expenditures now or in the near future that may well serve him for many years in the future." The court preferred to err on the side of ensuring that Trent had sufficient funds available for those purposes now.

As plaintiffs point out, their life care experts testified that the standard of care required that for the first five years of his injury, Trent should be evaluated annually by the spinal cord center at Craig Hospital in Colorado. There, during a three- to five-day stay, Trent would be exhaustively evaluated by multiple physicians, receive physical and occupational therapy and be evaluated for his functional abilities with the various devices he needed to use. After the first five years, he would need to attend that program only every four or five years. The witness testified that patients who attend that program typically live longer than those who do not, and that a spinal cord patient who received optimum care could have a normal life expectancy. The annual cost of that program for Trent from ages 46 to 51 would be $60,843.59. Trent's attendance at that program could also result in additional equipment and medical costs if it were determined that Trent's needs would be better served by other modalities. Later, less frequent reassessments should suffice because Trent's needs would have been determined during the earlier

41

assessments.  This evidence supports the trial court's conclusion that Trent needed larger payments earlier in his life than he would need later.  Accordingly, the trial court did not abuse its discretion.

5.

## THE JUDGMENT WAS ERRONEOUSLY ENTERED IN FAVOR

## OF PLAINTIFFS JOINTLY

Defendant also points out that the judgment of $5,950,002 for compensatory damages was entered in favor of both Trent and Lisa Hughes.  We have previously noted that the court erroneously treated both the settlement and the judgment as though they applied equally to Trent and Lisa.  The judgment should separately state the damages awarded to each plaintiff.

6.

## DEFENDANT SHOULD NOT HAVE BEEN REQUIRED TO POST

## SECURITY FOR PAYMENT OF THE JUDGMENT

Code of Civil Procedure section 667.6 provides in part:  "As a condition to authorizing periodic payments of future damages, the court shall require the judgment debtor who is not adequately insured to post security adequate to assure full payment of such damages awarded by the judgment." (Code Civ. Proc., § 667.7, subd. (a).)

Here, the judgment required defendant to post security adequate to assure full payment of the judgment.  Defendant contends that this was error because he submitted a declaration from his professional liability insurer which stated that the insurer accepted responsibility to pay the entire judgment, and that the insurer had assets exceeding

42

$1 billion. The point appears to be well taken. Plaintiffs do not provide any argument or authority in opposition to defendant's assertion, nor do they point to any contrary evidence in the record. Accordingly, on remand, we will direct the trial court to omit the security requirement from the judgment.

## DISPOSITION

The superior court is directed to correct the judgment as follows:

1. Offset the judgment for Trent Hughes' economic damages by $2,707,296;

2. Offset the judgment for Trent Hughes' noneconomic damages by $146,364;

3. Offset the judgment for Lisa Hughes' damages by $146,340;

4. Recalculate the periodic payments applying the above offset to Trent Hughes' economic damages; and

5. Delete the requirement that defendant post security for payment of the judgment.

43

The superior court is further directed to issue an amended judgment incorporating the above corrections.  The judgment is otherwise affirmed.  Plaintiffs are awarded costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER

Acting P. J.

We concur:


RICHLI

J.


CODRINGTON

J.